IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                                                                                            REPORT AND
                               Plaintiff,                                  RECOMMENDATION

     v.

                                                                                           10-cr-76-bbc

MERARI GARCIA-ARCOS,

                               Defendant.
_____

## REPORT

The grand jury has charged defendant Merari Garcia-Arcos with being an illegal alien in unlawful possession of a firearm based on an investigation conducted by the Lafayette County Sheriff's Department on March 25, 2010. Police recovered a handgun and other evidence from a bedroom closet and dresser in the residence of MST,[1] who reported the presence of the firearm and provided consent to search. Garcia-Arcos subsequently made self-inculpatory statements when interviewed by a detective at work. Garcia-Arcos has moved to quash the consent search and to suppress his statements. *See* dkt. 21. For the reasons stated below, I am recommending that court deny both parts of the motion.

On August 6, 2010, this court held an evidentiary hearing. Having heard and seen the witnesses testify, having made credibility determinations, and having viewed the relevant exhibits, I find the following facts:

## FACTS

On March 24, 2010, MST telephoned the Darlington Police Department to complain of domestic abuse at the hands of Merari Garcia-Arcos. On March 25, 2010, the police referred

---

[1] Although MST's name is in the record, the government refers to her by initials based on her reports of domestic abuse at the hands of Garcia-Arcos.

MST to the Lafayette County Sheriff's Department. That same day, just before noon, Sheriff's Detective Jerrett Cook met with MST at the sheriff's department to take her statement. MST spoke very little English and Detective Cook did not speak Spanish, so Anthony Ruesga, an off-duty Darlington police sergeant who was a native Spanish speaker, was called in to interpret. Sergeant Ruesga already knew Garcia-Arcos and his family very well from previous contacts in the community.

Among other things, MST told Detective Cook that she lived at 6261 State Highway 11 with her two young children, her adult male cousin and her father. Until about January 25, 2010, Garcia-Arcos, her then-domestic partner and father of her children also had lived there. MST reported that while Garcia-Arcos had lived with her he had owned a handgun that he sometimes fired in the backyard. MST kicked out Garcia-Arcos on January 25 because he had choked her during a domestic dispute. Thereafter, Garcia-Arcos visited often and uninvited, attempting to cajole or threaten MST into resuming a relationship.

MST reported that the day before, March 24, 2010, Garcia-Arcos had come to the house unannounced and either let himself in or was let in by the children. He refused MST's demands that he leave and tried to initiate physical contact with MST, finally carrying MST into her bedroom against her will and tossing her on the bed. Their young daughter was present in the bedroom. When MST persisted in rebuffing Garcia-Arcos, he walked to the bedroom closet and took something out. Garcia-Arcos turned to face MST and pulled his handgun from behind his back. MST had not realized that the gun still was in the house. Garcia-Arcos announced that he was going to kill MST and pointed the gun at her. MST rushed at Garcia-Arcos and shouted for her cousin, who answered her call. Garcia-Arcos tossed the handgun back in the closet, put

his hands up in front and told the cousin that everything was okay. MST told her cousin that Garcia-Arcos had pulled a gun her. She retrieved it from the closet and gave it to her cousin.

MST reported that Garcia-Arcos wouldn't leave the house, so MST left with her daughter and called home later. Her cousin reported that he still had the gun and that Garcia-Arcos had left. MST called the police department twice that evening and left messages, but apparently no one on duty spoke Spanish, so no one responded until the next day, March 25, 2010.

MST told Detective Cook that she wanted a restraining order against Garcia-Arcos. Detective Cook helped her fill out the paperwork. Detective Cook asked if the handgun still was at her house; she responded that it was. Detective Cook asked if he and Sergeant Ruesga could retrieve it; MST agreed that they could.

The three drove to MST's residence, arriving at about 1:40 p.m. The cousin was home and confirmed that he had put the gun back in MST's bedroom closet. MST reiterated her consent for the officers to search her bedroom. Detective Cook found a .22 caliber handgun on the closet shelf and seized it. On a bedroom dresser in plain view Detective Cook saw a Resident Alien Card in Garcia-Arcos's name and a social security card in another man's name. Detective Cook deemed both documents fakes and seized them as evidence.

Within an hour, at about 2:40 p.m., Detective Cook and Sergeant Ruesga drove to the cheese company where Garcia-Arcos was employed to see if he was working. He was, so a supervisor brought him to a common room in the plant to meet with Detective Cook and Sergeant Ruesga. The room was on the second floor, apparently past the receptionist, had two doors and was furnished with chairs and tables.

The three men sat facing each other, with Garcia-Arcos closest to the unlocked door, about three feet to his right. The officers were in plain clothes. Detective Cook displayed his

3

badge and identified himself.  Sergeant Ruesga, whom Garcia-Arcos already knew, was there to interpret; he was not on duty.  Neither officer displayed a weapon or handcuffs.  Neither officer told Garcia-Arcos that he was in custody or that he was not free to leave; conversely, they did not tell him that he was *not* under arrest, or that he was free to leave.  No one provided Garcia-Arcos with warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  Detective Cook questioned Garcia-Arcos for about 25 minutes (including translation time).  Garcia-Arcos responded with self-incriminating statements about his domestic dispute with MST, his status as an illegal alien and his possession of the handgun. At the end of the interview, Detective Cook arrested Garcia-Arcos for the domestic dispute.  During booking at the jail, Garcia-Arcos reported that his home address was 828 Keep Street, Darlington.

## ANALYSIS

**I. The Search of 6261 State Highway 11**

Garcia-Arcos contends that items seized during the search of MST's residence must be suppressed because Detective Cook did not first obtain a search warrant and Garcia-Arcos did not consent to the search.  Although the government disputes whether Garcia-Arcos even has a legitimate expectation of privacy in this residence that would allow him to assert a Fourth Amendment claim, in the end it doesn't matter: MST's consent sufficed.  The consent of a person who has common authority over a residence is valid against the absent nonconsenting person with whom that authority is shared.  *United States v. Jackson*, 598 F.3d 340, 346 (7th Cir. 2010), quoting *Georgia v. Randolph*, 547 U.S. 103, 110 (2006).

4

There is no genuine dispute that MST consented to a search of her bedroom and that Detective Cook found and seized the contested evidence without opening any closed containers over which Garcia-Arcos maintained exclusive control. Garcia-Arcos's quibbling arguments to the contrary (*see* dkt. 29 at 8 and dkt. 31 at 5-6) do not call into question the adequacy of MST's consent to search her own bedroom. I heard and saw the witnesses testify; among other things, I have credited Sergeant Ruesga's testimony that when they all arrived at MST's home, MST explicitly re-confirmed her consent to search her bedroom for the gun. It is very clear from context that this was a completely knowing and voluntary decision on her part.

As for the scope of the search, Garcia-Arcos did not even raise this argument until his reply brief, which constitutes waiver, *see United States v. Haynes*, 582 F.3d 686, 704 (7th Cir. 2009). In any event, the cases he cites regarding apparent authority are factually and legally inapposite. MST had actual authority to consent to a search of every room in her home. Neither the handgun nor the identification cards were cached inside closed containers of any sort, let alone in closed containers over which Garcia-Arcos exercised exclusive control and authority.[2] It seems that Garcia-Arcos is arguing that Detective Cook couldn't seize the handgun or the documents because they belonged to him, not to MST. *See* dkt. 31 at 6. This is incorrect. By leaving his belongings in an area over which MST had authority to consent to a search, Garcia-Arcos assumed the risk that MST might permit access to others, including the police. *United States v. Groves*, 530 F3d 506, 509 (7th Cir. 2008).

In sum, this was a constitutionally reasonable search and there is no reason to suppress any evidence derived from it, including Garcia-Arcos's statements during questioning.

---

[2] *See, e.g., Jackson*, 598 F.3d at 347.

**II. Garcia-Arcos's Statements**

What remains is Garcia-Arcos contention that Detective Cook questioned him at the cheese factory without first providing *Miranda* warnings. Garcia-Arcos seems to assume that *Miranda* warnings are required whenever law enforcement officers question a suspect with the intent to obtain inculpatory statements. But *Miranda* warnings are not required unless the interrogation is *custodial*. *E.g., United States v. Podhorn*, 549 F.3d 552, 556 (7th Cir. 2008). The need for *Miranda* warnings is triggered by the inherently coercive nature of the custodial setting, not by the strength or content of the government's suspicions. *Smiley v. Thurmer*, 542 F.3d 574, 582-83 (7th Cir. 2008). Therefore, Detective Cook's subjective intent or unspoken agenda during this interrogation is essentially irrelevant to the analysis. *See United States v. Stewart*, 536 F.3d 714, 720-21 (7th Cir. 2008).

The relevant question is whether Garcia-Arcos's interrogation was custodial, that is, whether a reasonable person in his circumstances would not have felt free to leave. As with his scope-of-the-search argument, Garcia-Arcos did not develop this argument until his reply brief, and only then because the government dealt fleetingly with this issue in its response.[3] Even so, this is the only defense argument that has any traction at all, so it merits substantive consideration by the court.

When determining whether a suspect was in custody during interrogation, the court should consider factors such as the suspect's freedom to leave the scene and the purpose, place and length of interrogation. *United States v. Podhorn*, 549 F.3d at 556. In *United States v. Budd*,

---

[3] Garcia-Arcos also flirts with a claim of involuntariness, *see* dkt. 31 at 9, although the case he cites, *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (the passage he quotes actually is at 442) deals with the constitutionality of 18 U.S.C. Sec. 3501, a legislative attempt to overrule *Miranda*.

549 F.3d 1140, 1145 (7th 2008) the court broke the inquiry into even more factors: (1) whether the encounter occurred in a public place; (2) whether the suspect consented to speak with the officers; (3) whether the officers informed the suspect that he was not under arrest and was free to leave; (4) whether the suspect was moved to another area; (5) whether there was a threatening presence of several officers and a display of weapons or physical force; (6) whether the officers deprived the suspect of documents needed to continue on his way; and (7) whether the officers' tone of voice was such that their requests likely would be obeyed.

In his affidavit in support of his motion (dkt. 24) Garcia-Arcos proclaims that he was "detained," "subjected to extensive interrogation," "under duress" and "under the custody of" Detective Cook and Sergeant Ruesga. Garcia-Arcos does not develop any facts or arguments regarding custody in his first brief (dkt. 29) but offers both in his reply (dkt. 31 at 7- 9).[4] Running the list from *Budd* shows that:

(1) The interrogation took place in a quasi-public place: it wasn't a public street corner, but neither was it the police station or the back of a squad car: it was a common area in the factory where Garcia-Arcos was on the job. One logical implication of this choice of locations was that Garcia-Arcos might be returning to finish his shift when the interview was done.

(2) The record is silent on whether Garcia-Arcos explicitly consented to speak to the officers, but I surmise from his affidavit that he did not. Garcia-Arcos claims in his affidavit to have been "detained" and "under duress" (dkt. 24, ¶ 3), which leads me to surmise that he did

---

[4] That said, his citation to *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001) is irrelevant. In *Briggs*, the defendant was arrested, jailed, *Mirandized*, then questioned; his claim was that the police did not honor his explicit request for a lawyer. *Id.* at 739.

not wish to speak to the officers, but he does not claim to have told this to the officers and he does not report any facts suggesting that the officers overcame his free will and compelled him to sit and talk.

(3) Detective Cook did not tell Garcia-Arcos that he was free to leave, nor did he tell him that he could not leave. Garcia-Arcos sat nearest to the door, which was about three feet away.

(4) The police did not move Garcia-Arcos anywhere. They met him in a location apparently selected by the employer, who also arranged for Garcia-Arcos to be brought to the same room, which was described as a common room at the factory.

(5) Neither officer displayed or used force against Garcia-Arcos. The presence of two officers, given the need for an interpreter, was not objectively threatening. Both officers were in plain clothes, Ruesga was off-duty, and he and Garcia-Arcos already knew each other.

(6) Detective Cook did not take any documents from Garcia-Arcos that would have prevented him from returning to work or from leaving the building and going home.

(7) The record is silent on the tenor of the interrogation. Having heard and seen Detective Cook and Sergeant Ruesga testify, it is difficult to imagine that they would have been anything other than calm and cordial toward Garcia-Arcos, but I will not speculate. The interrogation lasted about 25 minutes, including translation time. This qualifies as relatively brief. Garcia-Arcos claims to have been questioned "extensively," which is accurate in that Detective Cook raised several different topics, but inaccurate if meant to imply that the questioning was lengthy or tiring.

The factors cut in both directions (or are not sufficiently developed to have direction) but their *gestalt* is that Garcia-Arcos's interrogation at the cheese factory was not custodial. I do not

8

doubt that Garcia-Arcos was anxious, perhaps even alarmed at having been brought from the factory floor to the common room to speak with law enforcement officers, but the relevant question is whether he was in their custody while Detective Cook questioned him. An objective person in this situation would not have felt that his freedom of movement had been curtailed to a degree associated with formal arrest. The fact scenario of *Podhorn*, 549 F.3d at 556-57 is similar (not identical) and the court there found that the defendant (who was more legally sophisticated than Garcia-Arcos) had not been in custody during his 15 to 30 minute "encounter" with ATF agents holding undisclosed arrest warrants in their pockets who drove defendant in their van to his business during a search pursuant to a warrant.

Because Garcia-Arcos was not in custody during the interrogation, it was not constitutionally improper for Detective Cook to eschew *Miranda* warnings. Therefore, this court should not suppress Garcia-Arcos's statements.

## RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that this court deny in all respects defendant Merari Garcia-Arcos's motion to suppress physical evidence and to suppress his post-arrest statement.

Entered this 26th day of August, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge